# Irwin *versus* Trego.

1. Though a sale of unseated land for taxes will not divest the taxes assessed upon it for the year of the sale, Liggett *v.* Long, 7 *Harris* 499, yet it does divest the lien of all taxes assessed for any year prior to that in which the sale is made.

2. Land was sold in 1832 for taxes, and was redeemed within two years from the sale: *Held*, that such sale extinguished a road tax assessed on the land for the year 1829, though it was not included in the list of taxes certified by the commissioners to the treasurer, and for payment of which the land was sold.

3. The road taxes of 1829 having been in law extinguished as respects the purchaser by the sale in 1832, the sale of the land in 1834 for such road tax conferred no title.

4. There being evidence in the case that a part of the tract sold for taxes was *seated* before the taxes imposed since its former sale, or not thereby extinguished, were assessed, it was not improper for the Court, in an ejectment against persons claiming under a sale in 1834, to say to the jury that the testimony *tended* to show that the land became seated in 1831, and so continued until after the second sale in 1834, no special instruction on the subject having been asked.

5. The acceptance by the purchaser of unseated land of the money paid for redemption of the land by one acting as agent for the owners, and the surrender of his deed, destroyed his title under the sale.

6. A receipt for taxes paid by the purchaser after the land had been redeemed, is immaterial.

7. A letter by the person who afterwards redeemed the land, addressed to the owners of it, giving information of the sale for taxes, and letters relative to the land, written by him or another one or more years after the redemption, and addressed to one of the defendants who claimed from the purchaser at the tax sale, were irrelevant, and inadmissible, on the part of the said claimant, to contradict the alleged fact of his agency when he redeemed the land.

8. The rejection of evidence, the admission of which would not have changed the result, is no ground of error.

9. Where one professing to act for the owners of land sold for taxes, procures from the purchaser a conveyance in his own name, but professedly received

[Irwin *v.* Trego.]

for them, and afterwards claims the title for himself, he cannot retain the possession against the owners till he has been reimbursed the consideration paid for the conveyance.

10. The agent was not protected against the claim of the heirs by the expiration of five years ·limited by the Act of 1804; nor was he entitled to compensation for improvements on the land, made after the conveyance to him.

ERROR to the Common Pleas of *Indiana county.*

This was an action of ejectment to September Term, 1849, by Joseph P. Trego and wife *v.* John Irwin, Joseph Taylor, and Rudolph Huzzard, for the one undivided fifth part of 240 acres of land in Young township, Indiana county.

See a report of this case when up on a former occasion, in 7 *Harris* 441, &c.

The wife of Trego claimed as an heir of James Dunwoody, who had been the legal owner.

The *defendants* claimed under a sale of the land as unseated for taxes, on the 23d June, 1834. The tract was warranted in the name of John Matthews for 300 acres; survey of 400½ acres. Patent to John Craig. Deed, John Craig and wife to George Evans, in trust for James Dunwoody, a lunatic, for 200¼ acres, which was the land in dispute. James Dunwoody died in June, 1826, leaving six children, of whom Mrs. Trego was one; one other child died intestate and without issue.

The property was assessed in the name of *John Matthews,* the *warrantee.*

The deed of the treasurer was to Hugh Bleakley; it was dated 23d June, 1834, and was, as alleged, sold on that day for *road tax* for 1829–30–31, and·1832, viz.: $3.42; and for county and state tax for 1833, $1.33 : in all stated to $4.83.· Consideration $76; taxes and costs $9.20½.

Deed, Hugh Bleakley to *Rudolph Huzzard,* dated 19th September, 1838, with special warranty. Consideration $115. Huzzard took possession and made some improvements.

On the part of the *plaintiffs,* testimony was given to show·that when Huzzard procured. the deed from Bleakley, the former represented to Bleakley that he was buying the land for the *owners.* It was also shown that one Joseph Turner, who,·it was alleged, acted as agent of the heirs of Dunwoody, redeemed the land on 13th June, 1836, two years after the sale in 1834.

On their part was also shown a sale of the same land for taxes on 11th June, 1832, to the same Hugh Bleakley, and a redemption of the same on 9th June, 1834, by Turner, professing to act in the matter as agent of the heirs of Dunwoody; and that Dunwoody received the redemption money, and surrendered the deed which he received after that sale.

As to the sale in 1832, the treasurer's sale book was offered in

VOL. X.—47

evidence; was objected to by defendants' counsel, but was admitted. In it was an entry as follows:

John Matthews, 200 acres; sold to Hugh Bleakley, June 11, 1832—deed executed. Redeemed by Joseph Turner, agent for the heirs of Dunwoody, 9th June, 1834—taxes and costs $2.20$\frac{1}{2}$; redemption money $6.19.

It was also contended, on part of the plaintiffs below, that the land, or a part of it, became *seated* as early at least as 1831. *David* Bleakley testified that "the first improvement on this tract was made in 1830 by Samuel Black; he built a cabin, cleared an acre or two, had a family, a cow and two horses. He stayed there two years, and sold to Conner. Conner came on immediately and occupied that house and land eight or nine years; he cleared some more. I never was along the lines of the tract. He said he had heard Conner say that he was on vacant land."

T. Anderson said, he told Conner that he believed he was on the Matthews tract, and that he wanted to assess him with it. "He denied it, and said he had but five acres, showing me where his lines ran."

Hugh Bleakley testified, *inter alia*, that Black's house was five or six rods inside of the Matthews survey.

He further testified that Huzzard came and told him he was appointed by the heirs to get his claim in some way for them.

He further said he would not have sold to Huzzard if he had not bought for the heirs; that he would have written to the heirs to come and take the land. He said, "I paid taxes on it after I bought it. I know nothing of the last redemption—(meaning the redemption by Turner)—I never got that money."

The letter of J. J. *Young*, referred to in the argument, was dated 10th June, 1834. It was addressed to Joseph Turner, and was to the effect that he (Young) redeemed the land in the name of Joseph Turner, without Turner's knowledge.

A variety of other evidence was given on the trial.

The charge of Burrell, President Judge, was, *inter alia*, as follows:

"As this land was *unseated* in 1829 and 1830, the first sale for taxes in 1832 seems to have been a valid one. The validity of the alleged redemption by Turner would depend on *the fact of his agency for the owners*, the evidence in relation to which, being a contested question, we submit to the jury. If they find he was such agent in 1834, then it is shown he redeemed the land on the 9th June of that year. But, at all events, it appears that Bleakley surrendered his deed under the sale of 1832, to the treasurer, and accepted the redemption money, and this we think put an end to his title under that sale. The jury is instructed that the sale of 1832 extinguished and satisfied all taxes assessed on this land

[Irwin v. Trego.]

*prior thereto ;* that no valid second sale could be made for the same taxes; and if they find the land *became seated* in 1831, and so continued until after the second sale, in 1834, *which the testimony tends to show,* then the second sale was void, the land being seated during the only years for whose taxes it could be sold. Besides, if the jury find that Turner *was agent for the heirs,* it appears he again redeemed this land on the 13th June, 1836, which would avoid the tax sale.

"Albert Way and Hugh Bleakley testify in substance, that Huzzard represented himself as agent for Dunwoody's heirs; that he was redeeming the land for them; got the deed from Bleakley in his own name, so as to remain until the heirs would reimburse or compensate him ; and afterwards said he redeemed the land for them. If the jury believe these witnesses, they are instructed that Huzzard, in making these statements and declarations, must be taken to have told the truth, as they were contrary to the interest he now asserts; and to allow him to keep the land, as he endeavors to do, would be to allow him to perpetrate a successful fraud upon these heirs. We may presume he lifted his note and paid Bleakley; but his attempted fraud, if Way and Bleakley are believed, entitles the heirs to recover the land without previous actual or proffered reimbursement."

March 29, 1853, verdict for plaintiffs for one undivided fifth part of the land described in the writ, and that the defendant's improvements are worth $250. July 1, 1853, that part of the verdict relating to the defendant's improvements was stricken off, and judgment was otherwise entered on the verdict.

It was assigned for error : 1. That the Court erred in admitting a deposition of Albert Way, to establish a trust in Huzzard. (This related to declarations by Huzzard that he had redeemed the land for the heirs.) 2. In admitting that part of the testimony by Bleakley of a statement by Huzzard, that he had been appointed by the heirs to get Bleakley's claim. 3. In admitting evidence of the treasurer's sale in 1832. 4. In rejecting letters of Joseph and James Turner, offered on part of defendants. These letters related to the sale of the land; one of them was addressed to the heirs of Dunwoody in April, 1834, before the redemption; the others were addressed to Huzzard in 1836–38, 1842–43. 5. That the Court erred in rejecting the receipt of Isaac M. Watt to *Hugh Bleakley.* This was a receipt by Watt, as treasurer, dated 13th June, 1836, for $4.30, *the taxes on the John Matthews tract for the years* 1833– 34. 6. That the Court erred in rejecting the list of unseated land and the return of the supervisors. 7. In instructing the jury that the sale of 1832 extinguished and satisfied "*all taxes assessed on this land prior thereto.*" 9. In charging that the testimony *tended*

[Irwin *v.* Trego.]

*to show* that the land became seated in 1831, and so continued. 10. In instructing them that the declarations of Huzzard to Bleakley and Way were proof of a fraud upon the heirs, such as would entitle them to recover the land without previous actual or proffered reimbursement. 11. In not instructing the jury as requested, that the plaintiffs, not having brought their action *within five years from the treasurer's sale,* were not entitled to recover. 12. In striking off that part of the verdict which allowed the defendants compensation for their improvements.

*Drum,* for plaintiffs in error.—As to the charge relative to the land being seated, it was observed that the occupation of a small part of a tract as distinct and separate from the remainder, will not render the whole seated. "Black occupied but a few rods of this tract, although it seems his house was within the lines." Cited 1 *Watts* 503; 5 *W. & Ser.* 451; *Id.* 359; 3 *Id.* 238. It was said that if these authorities show that the tract was still unseated in 1833, then the sale of 1832 did not impair the operation of the sale of 1834.

As to the portion of the charge that the sale of 1832 extinguished all taxes prior thereto, it was said that the Court rejected the return of the supervisors, dated 29 June, 1831, which was offered to show that when the commissioners certified to the treasurer the taxes for which the sale in 1832 was afterwards made, the *road taxes* of 1829, viz.: $1, had not been returned to the commissioners. This road tax for 1829 was included in the taxes at the sale in 1834. It was contended that such road tax not having been returned when the sale in 1832 was made, the sale in 1832 did not extinguish it.

But granting that the sale in 1832 extinguished all previous taxes (the road tax of 1829 included), it was said that Turner was not the agent of the owners, and having no authority to redeem the land, the redemption by him, after the sale in 1832 to Bleakley, was void; that the title remained in Bleakley who conveyed to Huzzard. Also, that the testimony and letter of *Young* showed that the redemption was unauthorized, and that *Turner* never made it. That if Bleakley surrendered his deed under the false representation that the land had been rightly redeemed, his title under the sale in 1832 would not be extinguished. That the heirs never ratified the redemption until the bringing of this suit, seventeen years afterwards. That unseated land can be redeemed only by the true owner, or some one authorized by him : 2 *Watts* 436, McBride *v.* Hoey.

Also; that the letters of Turner were offered to show acts and declarations inconsistent with his alleged agency. That his redemption, if it ever occurred, amounted to a declaration that he was

[Irwin *v.* Trego.]

the agent, which, it was alleged, he had a right to contradict at another time : 5 *Harris* 230.

The receipt of Watt, Treasurer, to Bleakley, dated 13th June, 1836, for the taxes of 1833–4, was dated on the same day that the redemption by Turner was said to have taken place; and it was contended that it was admissible to show that Watt had not received any money for redemption from Turner.

*Banks*, for defendants in error.

The opinion of the Court was delivered by

KNOX, J.—The plaintiffs below, Trego and wife, brought this action of ejectment to recover possession of the one undivided fifth part of a tract of land in Young township, Indiana county, as heirs at law of James Dunwoody, who was the owner at the time of his death, in 1826.

The defendants claimed title under a conveyance from James Bleakley, who had purchased at a tax sale in 1834.

To avoid the effect of the treasurer's deed, it was alleged by the plaintiffs, 1st. That the land was seated when the taxes were assessed, at least such portion of them as the sale could legally include. 2d. That there had been a redemption within two years from the sale, by the agent of the heirs of Dunwoody. And 3d. That Huzzard was acting as their agent or trustee in procuring the conveyance from Bleakley.

The sale in 1834 was for the taxes of 1829–30–31 and 1833. Evidence was given, tending to show that the tract became seated in 1830 or 1831, and remained so up to the time of the sale in 1834, and to cut out the assessments of 1829–30 and 1831, it was shown that the same tract had been sold as unseated for non-payment of taxes by the treasurer of Indiana, to James Bleakley, on the 11th of June, 1832, and redeemed by Joseph Turner, agent for the heirs of Dunwoody, within two years from the sale, and that the redemption money had been accepted by the purchaser, and the deed delivered to the treasurer.

The Court below instructed the jury, "that the sale of 1832 extinguished and satisfied all taxes assessed on this land prior thereto; that no valid second sale could be made for the same taxes, and if they found the land became seated in 1831, and so continued until after the second sale in 1834, which the testimony tends to show, then the second sale was void, the land being seated during the only years for whose taxes it could be sold."

This instruction is complained of, and two errors are assigned upon it, viz.:

8th. " The Court erred in instructing the jury that the sale of

2 I

[Irwin *v.* Trego.]

1832 extinguished and satisfied all taxes assessed on this land prior thereto."

9th. "The Court erred in charging the jury that the testimony tended to show that the land became seated in 1831 and so continued."

In Liggett *v.* Long, 7 *Harris* 499, in an opinion delivered by Justice Lewis, it was held, that a treasurer's sale on the 18th June, 1834, for non-payment of taxes on unseated lands for the years 1832 and 1833, did not extinguish the lien of the taxes for the year 1834, and that the land might again be sold for the taxes assessed in 1834.

I yield a ready assent to the authority of this case, as a contrary doctrine might work injustice to the public. It frequently happens that the taxes for the current year are not, and cannot be returned in time for the commissioners to include them in the list furnished the treasurer; and as the purchaser has notice by his deed what taxes are embraced in the sale, he cannot complain of being misled.

But why should not the sale be held to divest the lien of all taxes assessed for years prior to that upon which it is made? County and state taxes are assessed in the fall of the preceding year, and road taxes in the spring. There can be no difficulty, with ordinary diligence, in furnishing to the treasurer a statement of such of the unseated taxes as remain unpaid, long before it is necessary for him to give the requisite notice of the sale, and such as are not included may fairly be presumed by the purchaser to have been in some manner satisfied.

In Fager *v.* Campbell, 5 *Watts* 287, it was determined that a sale for taxes divests the lien of a mortgage, and the late Chief Justice Gibson, in delivering the opinion of the Court, says, "Necessity requires that the public duty should be held paramount to all others; and if a judicial sale shall clear the title of encumbrances there is more urgent reason that a treasurer's sale should have the same effect."

If the land in the hands of a purchaser is free from encumbrances due to strangers, is there any reason why an existing lien in the nature of a tax should outlive the sale? The whole policy of our recent legislative enactments and judicial decisions has been to protect tax titles and thereby encourage purchasers, as it is often the only means of enforcing the payment of taxes against uncultivated lands. It would doubtless deter persons from bidding at tax sales if it is understood that the lands may again be sold for taxes assessed long before the purchase. If the taxes are returned, they may be and should be included in the sale. If they are not returned, their lien, if any exists, is a secret one, and should have no force as against a *bonâ fide* purchaser.

[Irwin v. Trego.]

Subject to the exception that the year in which the sale takes place is not to be included, I think the rule is a sound one that was applied by the Judge of the Common Pleas, and as the exception would have no effect upon this case, the mistake in this respect is an immaterial one.    The evidence certainly " tended to show that the land became seated in 1831, and so continued," and this is all that was said by the Court.    The instruction might have been given more in detail as to what would change a tract from unseated to seated; but we cannot reverse because the law is not fully explained, when such explanation is not solicited.

It follows from what has been said, that there was no error in admitting the evidence of the treasurer's sale in 1832; and it is equally clear that the payment of the redemption money by Turner, and its acceptance by Bleakley, the purchaser, prevented the sale from impairing the title of the Dunwoody heirs.    It is not under the sale of 1832 that the defendants claim.    It was given in evidence, not by them, but by the other party, and I cannot see the force of their objection to the first redemption.

The question of the agency of Joseph Turner was fairly submitted to the jury.

The letters of Joseph and James Turner, and the receipt of Isaac M. Watts, were irrelevant and properly rejected.

The list of unseated land, and the return of the supervisors, mentioned in the sixth bill of exceptions, would not have changed the legal effect of the sale of 1832, and therefore ought not to have been received.

I have thus far disposed of the 3d, 4th, 5th, 6th, 7th, 8th, and 9th assignments of error.

The 1st, 2d, and 10th, relate to the purchase by Huzzard from Bleakley, and will be considered together.

Bleakley testifies, that some time after his purchase he had a letter written to the heirs of Dunwoody.    That Huzzard came on, and told him that he was the man who was appointed by the heirs to come and get his claim up, and purchase it in some way.    That he went with Huzzard to the land and showed him the lines. Huzzard told him that his title was worth nothing; that he could easily get round it, but that he had acted honorably in writing to them, and he wanted him to get something.    That he would give him his note for $115 if Bleakley would give him a deed in his own name, until such time as the heirs would fix it with him ; that when he got home they would fix it all right.    He said repeatedly " every heir should get their share ; all he wanted was to secure himself as to the $115."    Part of the contract was that the heirs were all to get their shares.

The consideration was paid by Huzzard, viz. $115.    Upon his cross-examination the witness stated that he would not have sold

[Irwin *v.* Trego.]

to Huzzard if he had not said he was buying for the heirs; and that if Huzzard had not bought he would have given it up to the heirs.

The deposition of Albert Way was read in evidence, which proved, that in the fall of 1838, Huzzard told him he had been out to see about the Indiana lands; that they had been sold for taxes, and he had redeemed them for the heirs. Said that he would be willing to take the land at a fair valuation and pay off the heirs. He made no claim to the land himself. Mrs. Way, the wife of the witness, was one of the heirs of Dunwoody.

Under this evidence, the judge below instructed the jury, that if the witnesses were believed, it would be a fraud upon the heirs of Dunwoody to allow Huzzard to keep the land; and that his attempt to do so authorized a recovery without previous actual or proffered reimbursement.

If Huzzard in obtaining the conveyance from Bleakley was acting as agent for the heirs of Dunwoody, everything that was done by him should enure to their benefit. If he was intrusted by them to negotiate with Bleakley for the redemption or purchase of the land, he could not, by taking the deed in his own name, set his constituents at defiance. Huzzard surely cannot complain if he is taken at his word. He told Bleakley that he was acting for the heirs, and Bleakley says that it was upon this representation that he was induced to part with the title. If he had acted honestly he could have held the estate until he was repaid his advances; but his conduct in denying the claim of his principals leaves him without even this ground to fall back upon. We see no error in this branch of the case.

The defendant was not protected by the statute of limitations under the Act of 1804, nor was he entitled to compensation for his improvements.

Judgment affirmed.